### BOWLES, Price Adm'r, OPA, v. VILLARI et al.

### No. 4531.

District Court, E. D. Pennsylvania.
July 11, 1945.

Walter N. Moldawer, Erwin Lodge, and Robert J. Callaghan, all of Philadelphia, Pa., for plaintiff.

C. Brewster Rhoads and C. Russell Phillips (of Montgomery, McCracken, Walker & Rhoads), both of Philadelphia, Pa., for Moore Street Cooperative Ass'n.

Frank F. Truscott and George D. Kline, both of Philadelphia, Pa., for Villaris and Moore Street Cooperative Ass'n.

BARD, District Judge.

This is an action brought by Chester Bowles, Price Administrator, Office of Price Administration, (1) to enjoin violations of Section 4(a) of the Emergency Price Control Act of 1942 as amended [1] and of Revised Maximum Price Regulation No. 169, "Beef and Veal Carcasses and Wholesale Cuts", 7 F.R. 10381, issued under the Act; and (2) to recover treble damages on behalf of the United States of America. Jurisdiction is conferred upon this Court by Section 205(c) of the Act, 50 U.S.C.A.Appendix § 925(c).

I make the following special

## Findings of Fact.

1. Defendants Samuel Villari, Peter Villari and John Villari are, and since December 14, 1939, have been, engaged in the slaughtering business as copartners trading as S. Villari and Sons. The partnership owns and operates a slaughtering plant and abattoir at 220–230 Moore Street, Philadelphia, Pennsylvania.

2. Defendant Moore Street Retail Meat Cooperative Association is, and has been since July 5, 1944, a corporation organized and existing by virtue of the laws of the State of Pennsylvania. The office and principal place of business is at 220–230 Moore Street, Philadelphia, Pennsylvania, the identical office and plant used by the Villaris. The cooperative is engaged in the business of buying, selling, slaughtering and dealing in animals, meats and provisions.

3. Defendants Emerson V. Wilson, George Braun and Morris Kanefsky are respectively the President, Secretary and Treasurer of Moore Street Retail Meat Cooperative Association.

4. Pursuant to the provisions of Section 2(a) of the Emergency Price Control Act of 1942 as amended, 50 U.S.C.A.Appendix § 902(a), the Price Administrator issued Revised Maximum Price Regulation No.

---

[1] 56 Stat. 23, 765, 57 Stat. 566, 50 U. S.C.A.Appendix § 904(a).

169, 7 F.R. 10381, effective December 16, 1942, which Regulation, as amended, has been at all times until the date hereof in full force and effect. This regulation establishes maximum prices for the sale, purchase, delivery or receipt of beef and veal carcasses and wholesale cuts and prohibits violation of the price ceiling by direct or indirect evasive methods.

5. For some time prior to June, 1944, S. Villari & Sons contended they were unable to operate profitably due to the insufficient margin between the ceiling price for dressed meat established by Revised Maximum Price Regulation No. 169 and the rising price of livestock.

6. During the early part of June, 1944, Samuel Villari consulted his attorney, Arthur E. Dennis, Esquire, to discuss the possibility of evolving a plan whereby the Villaris could operate their business at a profit.

7. Mr. Dennis suggested to Samuel Villari that a cooperative association composed of S. Villari & Sons' customers be organized for the purpose of operating a slaughtering business; that the cooperative association buy or lease the Villaris' plant and equipment and employ Villari and his sons to manage and operate the slaughtering business for the cooperative association. Pursuant to the plan suggested by Dennis, on June 27, 1944, a letter was sent by Villari to his customers inviting them to attend a meeting at Dennis' office to discuss "ways and means of remaining legally and profitably in business."

8. On June 29, 1944, the meeting was held at the office of Mr. Dennis. There were present at this meeting defendants Samuel Villari, John Villari and Peter Villari; defendants Emerson V. Wilson, George Braun and Morris Kanefsky; Arthur E. Dennis, Esquire; Sidney Berg, Esquire, an associate of Mr. Dennis as counsel in other retail meat cooperative associations; William H. Sherry, accountant for S. Villari & Sons; and about sixty retail meat dealers who were either customers of the Villaris or were retailers known to Mr. Dennis and invited to the meeting by him.

9. Samuel Villari spoke to the assemblage and told them he would be forced to close his business because he could no longer operate profitably. Mr. Dennis advised the retail meat dealers that, unless they organized a cooperative association, rented the Villari plant and employed the Villaris to operate the establishment, Villari would close his establishment and the supply of meat they were presently receiving from S. Villari & Sons would be ended.

10. Mr. Dennis then outlined the general plan of the proposed cooperative association: That Villari would lease his slaughter house and equipment to the association for $450 per week; that Samuel Villari would accept $150 per week as salary; that Peter Villari and John Villari would each accept $75 per week as salary; that the Villaris would manage and operate the slaughtering plant; that the Villaris would purchase live cattle, kill the cattle, and dress the beef in the same manner in which S. Villari & Sons had heretofore conducted its business but under the supervision and direction of the cooperative association; that Villari reserved the right to slaughter for himself in the conduct of his own business; that the lease and the contract of employment would be terminable at the option of either party upon fifteen days' notice.

11. Mr. Dennis then informed the assemblage that under government regulations Villari could not slaughter more than fifty-one army style cattle each week; that Villari had agreed to slaughter the fifty-one head of army style cattle per week, together with some inferior grades of cattle, calves, and lambs, totalling a minimum of 50,000 pounds of dressed meat weekly; that this limited supply of dressed beef would have to be distributed among the members of the cooperative in proportion to their needs; that members of the cooperative would be preferred over non-members in the distribution of meat and only after the requirements of members were filled then the excess, if any, could be sold to non-member retailers.

12. The retailers were also informed by Mr. Dennis that the margin between the price of live cattle and the price ceiling for dressed meats was so small that the cooperative could be expected to lose money; that economies might be effected by efficient operation, by not providing delivery service, and by changing the types and grades of animals to be slaughtered; that the cooperative should be able to realize a profit in the future if the government revised its price regulations; that the statute under which the cooperative was to be incorporated limited the subscription of members to a maximum of $1,000; and that, therefore, the members would be called upon to make additional investments from time to time since the original capital investment would

be insufficient to operate the business over a long period.

13. At the suggestion of Mr. Dennis, Sidney Berg, Esquire, was engaged to represent the retailers and to draw up the necessary organization papers and agreements with the Villaris. On the basis of the plan of operation proposed by Dennis and the statement by Villari that he was about to go out of business (as outlined in paragraphs 9, 10, 11 and 12, supra), the retailers proceeded to subscribe to shares of stock. The individual subscriptions were for $250, $500, $750 and $1,000, or 10, 20, 30 and 40 share lots at $25 per share, and the total subscription, including a few subscriptions made after the meeting but before incorporation amounted to $27,750 apportioned among seventy-two members. When the retailers present at the meeting had subscribed, the names of the subscribers were read from a list together with the number of shares each had purchased and the average number of sides of beef to which each subscriber would be entitled to receive each week conditioned on the availability of cattle. The relationship between the number of sides of beef per week and the number of shares subscribed was approximately one side of beef per week for every ten shares ($250).

14. At the conclusion of the meeting on June 29, 1944, the subscribers elected officers and directors, and instructed Berg to incorporate the cooperative and do whatever legal work was necessary to commence operation of the slaughtering business.

15. Mr. Berg, with the assistance of Mr. Dennis, counsel for Villari, prepared Articles of Association for the Moore Street Retail Meat Cooperative Association which were submitted to and approved by the Secretary of State of Pennsylvania on July 5, 1944.

16. On July 10, 1944, a committee authorized by the Board of Directors met with Dennis, Berg and Sherry and resolved that a lease and contract of employment be consummated with the Villaris on the terms outlined by Mr. Dennis at the meeting of June 29, 1944 (Par. 10). The Committee prepared a written lease and a written contract of employment between Samuel Villari and the Moore Street Retail Meat Cooperative Association dated July 17, 1944, for the term of one year, terminable at the will of either party upon fifteen days' notice and with a provision that ter-

mination of the employment contract automatically terminated the lease. These agreements were approved by the Board of Directors, but were never signed by Villari nor did the Board of Directors ever insist upon execution.

17. On or about July 15, 1944, the cooperative association commenced business operations under the management of Samuel Villari assisted by Peter Villari and John Villari. Supervision of the cooperative was nominally in the Board of Directors, but that supervision was in fact only perfunctory, the only actual evidence of control being a suggestion to Villari that he slaughter a lower grade of cattle to reduce operating losses.

18. The members of the cooperative purchased and received dressed meats from the cooperative in proportion to the amount which each had invested. The stockholders received an average of one side of army style beef weekly for each ten shares purchased and, in addition, small quantities of veal and lamb. Actually the weekly purchases of each stockholder varied from week to week, depending on the number of cattle slaughtered by Villari and the availability of the grade of beef required by the particular member. Because the cooperative was unable to supply the grade of meat desired, certain members purchased an average amount of beef less than the proportion of their investment.

19. The Board of Directors appointed Jacob Miller and Alphonse Cerceo, members of the cooperative, to audit the accounts of the stockholders' purchases of meats to determine whether certain members had received meat in excess of their proportionate investment in the cooperative. The audit showed that many of the members had received an excessive share of meat and, as a result of the audit, twenty-nine stockholders purchased additional shares.

20. On August 30, 1944, William H. Sherry, accountant for the cooperative, presented a financial report for the first six weeks of operation to the officers and directors. The financial report showed a net operating loss of $20,639.14 on a total capital investment of $27,750.

21. On the following day the cooperative called a meeting of the members to be held at the office of Dennis on September 7, 1944. Dennis, Berg, Sherry, Samuel Villari, Peter Villari, John Villari, and about

sixty stockholders attended the meeting. Dennis told the members that the cooperative lacked ready cash but had sufficient assets, and that it was the suggestion of the directors that the shareholders make loans to the cooperative in an amount equal to their initial investments. Most of the stockholders either pledged themselves to loan the money or actually made the loan at the meeting. No security or evidence of indebtedness was given to the members by the cooperative association for the money loaned.

22. On October 3, 1944, a financial report covering the five week period from August 26, 1944, to September 30, 1944, was presented to the Board of Directors and to a meeting of the shareholders held later on the same day at Mr. Berg's office. This report showed that the cooperative had suffered a net operating loss of $10,310.76 for the five week period and a total net operating loss since the commencing of business aggregating $30,949.90. Since the paid in capital was only $27,750, the operating losses had more than exhausted the capital investment in eleven weeks of operation.

23. Berg and Dennis told the shareholders that unless the members bought additional shares of stock and invested fresh capital, the cooperative would cease business and their supply of meat through the Villari packing plant would be stopped; and that those who had loaned money to the cooperative could apply the loan to the purchase of new shares.

24. Most of the members subscribed to shares in an amount at least equal to their original subscription. The total capital invested by shareholders now aggregated $66,125.

25. Some members who did not purchase additional shares of stock were made to understand that they no longer were to participate as members of the cooperative. They did not receive notices of subsequent meetings, nor did they purchase or receive any more sides of beef after the meeting, although some did purchase small quantities of meat products.

26. The financial report on November 1, 1944, covering a four week period from September 30, 1944, to October 28, 1944, showed a net operating loss by the cooperative of $7,694.97 and a total net operating loss since the commencement of business of $38,644.87.

27. During the five week period from October 28, 1944, to December 3, 1944, the cooperative incurred an additional net operating loss of $9,462.89 and a total net operating loss since the commencement of business of $48,107.76.

28. During the month of December, 1944, the net operating loss of the cooperative was $12,482.38 and the total net operating loss since the commencement of business was $60,590.14 on a total capital investment of $66,125.

29. On January 3, 1945, another general meeting of shareholders was held at the office of Mr. Dennis, at which there were present Dennis, Berg, Sherry, Samuel Villari, Peter Villari, John Villari, and most of the stockholders. Dennis explained the financial status of the cooperative and told them that unless more stock was purchased and additional capital provided by the members the cooperative would cease business and their supply of meat through the Villari slaughter house would end. The stockholders subscribed to an additional amount of stock at the meeting and within a short period thereafter, making a total investment since the organization of the cooperative of $102.725.

30. The stockholders who did not subscribe to stock at the meeting of January 3, 1945, did not receive meat thereafter except in isolated instances and in small amounts.

31. The financial report submitted on February 12, 1945, showed a net operating loss to the cooperative between January 1, 1945, and January 27, 1945, of $6,024.91 and a total net operating loss since the commencement of business of $66,615.05.

32. All the livestock processed and sold to the members of the cooperative were purchased in the name of the Moore Street Retail Meat Cooperative Association by the Villaris, as employees and agents, with funds belonging to the cooperative.

33. The sales of dressed meat to the members were made by the Moore Street Retail Meat Cooperative Association and not the Villaris, individually, or S. Villari & Sons. All individual sales of meat to the members of the cooperative were invoiced and paid for at ceiling prices established by Revised Maximum Price Regulation No. 169.

34. Throughout the entire period of operation from July 15, 1944, to March 6, 1945, the date this action was brought, the

cooperative made an aggregate payment of rent of $14,850 to Samuel Villari and an aggregate payment of salary to Samuel Villari of $4,950, to Peter Villari an aggregate payment of salary of $2,475, and an aggregate payment of salary to John Villari of $2,475.

35. The members of the cooperative subscribed to the stock of the cooperative association and reinvested capital in a cooperative which was operating at a loss solely for the purpose of obtaining a steady supply of meat not available in normal channels of business. The subscriptions were not made as long term investments to obtain future business profits.

36. The Moore Street Retail Meat Cooperative Association, in fact, was organized by Samuel Villari and his representatives for the purpose of selling dressed meats to his customers and other cooperative members in such manner as to obtain from them the entire cost of operation of Villari's slaughtering business including the cost of livestock, and to obtain a net return to himself and his sons, Peter Villari and John Villari, in an amount fixed by him, notwithstanding that the amounts paid by the members in the form of stock subscriptions were in fact paid as consideration for a supply of meat and were a part of the purchase price of the dressed meat in addition to the lawful ceiling price indicated on the invoices, and that the consideration paid for the meat in the form of stock subscription and invoice charges exceeded the maximum prices established by Revised Maximum Price Regulation No. 169.

## Discussion.

Defendants Samuel Villari, Peter Villari and John Villari have successfully operated a slaughtering business under the trade name of S. Villari & Sons for a number of years. Under authority of the Emergency Price Control Act of 1942, the Price Administrator issued, on December 10, 1942, Revised Maximum Price Regulation No. 169 establishing maximum prices for beef and veal carcasses and wholesale cuts.

The rising cost of livestock gradually reduced the margin between the cost of livestock and the ceiling prices of dressed meat until the Villaris contended that they could no longer operate at a profit and were, in fact, they maintained, faced with the possibility of paying a higher price for livestock than they could charge their customers for the processed carcasses. Upon advice of counsel, the Villaris met with their customers and other retailers and informed the retailers that they intended to cease operation and that supply of meat from the Villari plant would end. The retailers adopted a solution offered by Villari's counsel and organized a cooperative association to process meats and sell the meats to the members of the cooperative at ceiling prices, renting the plant and facilities of S. Villari & Sons and employing Samuel, Peter and John Villari to operate the slaughtering business.

The cooperative suffered continuous operating losses due to the high price of livestock and to the rent and salaries paid to the Villaris. The steady losses exhausted the paid-in capital and, on two occasions, the retailers had to purchase shares and invest new capital in the cooperative to insure a further supply of meat.

The Price Administrator contends that the purchase of shares in the cooperative association and the arrangement between the members of the cooperative, the cooperative, and the Villaris is tantamount to payment of additional consideration to the Villaris in excess of ceiling prices to obtain a supply of meat and is, therefore, an evasion of Revised Maximum Price Regulation No. 169. The Administrator seeks to enjoin further violation and asks that judgment be granted in favor of the Price Administrator on behalf of the United States of America against Samuel Villari, Peter Villari, John Villari, the Moore Street Retail Meat Cooperative Association and the officers of the cooperative for treble the amount of overcharge.

There were two facts repeatedly appearing throughout the testimony: First, that under existing governmental regulations neither the Villaris nor the cooperative could operate the slaughtering business at a profit; second, that the motive and purpose of the retailers for investing and reinvesting capital in a cooperative which they knew to be a losing business operation was to obtain a supply of meat in the midst of a national meat shortage.

Believing they could no longer continue to conduct their business in the manner in which the slaughtering plant had operated for many years, the Villaris readily adopted a plan suggested by their counsel which would enable them to evade the disastrous effect of the Price Regulation. Instead of operating without profit or even

at a loss, the Villaris were now assured of a weekly income of $750 for their personal services and for the use of the facilities which they owned. The losses caused by the abnormally high price of livestock which the Villaris had heretofore assumed were now to be subsidized by the cooperative and its members. The plan was equally attractive to the retailers. In return for the stock subscriptions which they knew would be expended and exhausted to pay the high prices demanded for livestock and to pay the weekly stipend to the Villaris, the retailers were assured of a weekly meat supply at a time when the meat supply from other slaughterers and packers was reduced to a minimum by the general meat shortage. Clearly, neither the Villaris nor the retailers expected the cooperative to be an extended business venture resulting in eventual profit after a period of heavy investment and sustained losses. This is made clear upon examination of the lease and the employment contracts. The agreements were terminable upon fifteen days' notice. Surely with this termination provision, no reasonable business man could expect Villari to continue to work for the cooperative if a future change in the regulations made the slaughtering business profitable again. It is not unfair, it seems to me, to conclude that the parties intended the cooperative to exist only so long as slaughtering had to be conducted at a loss and, just as soon as profit returned to the slaughtering business the agreements would be terminated and the cooperative venture would be at an end.

The retailers were expected to subscribe for stock in accordance with their needs or requirements, the small retailers in smaller amounts and the large retailers in larger amounts. The meat was to be distributed in the same manner, the larger dealers to receive a larger amount and the smaller dealers to receive a smaller amount in proportion to their needs. The conclusion is inevitable that it was the understanding of the parties that the stockholders would receive meats in proportion to their subscription. It is true that Mr. Dennis testified that there was no relationship between the stock subscriptions and the poundage of meat supplied to the subscribers. He further testified however: "There was, however, a reasonable relationship between the sides (of beef) as such and the stock, in that the smaller subscribers would get less of the Army style

meat of the fifty-one that we had to allocate and the larger subscribers would get more than the smaller subscribers of the Army style meat." In other words, the subscription was nothing more than a ticket permitting the owner to receive a portion of the fifty-one army style cattle slaughtered each week and the amount of meat received was determined by the amount paid for the ticket. Several subscribers unequivocally testified that they were informed at the organization meeting they would be permitted to purchase an average of one side of beef for each ten shares of stock purchased. Other members testified that, although no specific allotment of meat had been promised, the amount of their subscription and the proportion of meat they were to receive was directly related to the size of their business and their probable needs. When the cooperative began operation, the planned allotment was carried out with but a few minor discrepancies. When an audit of the accounts revealed that some of the members had received more than their allotted share in proportion to their investment, these members were required to purchase additional shares of stock. Again, when the original capital investment was exhausted and it became necessary to subscribe new capital, those who refused to invest more money were no longer considered members of the cooperative and no longer received meat except for isolated instances in small amounts, although these stockholders still owned their original shares which were now worthless to them as a means of obtaining meat. The money paid into the cooperative as a stock subscription was, in fact, paid as consideration for an allotment of dressed meat and was just as much a part of the purchase price of the meat as was the amount indicated on the invoices which was paid at the time of purchase and receipt. Since the dressed meat was invoiced at ceiling prices, the stock subscription, paid as additional consideration for the meat, was in excess of the established maximum prices and constituted violations of the Act.

Defendants urge that the Administrator's case is based on a charge of fraud and bad faith and is further based on the contention that the cooperative association was a fictitious device to evade the price regulations. Defendants argue that the testimony does not support these contentions. Clearly the retailers were not defrauded or deceived by the Villaris. During the entire

period between the organization meeting on June 29, 1944, and March, 1945, the retailers were fully cognizant of all the facts. They knew that Villari was about to close his slaughtering establishment, that they would be without meat, that formation of a cooperative would enable them to obtain meat, that the cooperative would be unprofitable, that the cooperative did, in fact, lose money throughout its operation, and that there probably would be no opportunity to recover their investment. It is also true that the cooperative was regularly and legally organized by the retailers under Pennsylvania law. But the record discloses that the motivating purpose of this cooperative was to obtain a supply of meat for its members from Villari despite a general meat shortage, to the exclusion of non-members, and to attain that result the retailers knew that they would have to assure the Villaris of a fixed weekly income so that the Villaris would continue to keep their slaughtering plant in operation. Villari testified that he could not operate the slaughtering plant at a profit when it sold dressed meat at ceiling prices under the existing price regulation. But upon organization of the cooperative, the Villaris obtained a total income of $750 per week even though the members of the cooperative purchased meat from the cooperative at the same price S. Villari & Sons had previously sold meat. Stripping the relationship of the cooperative and the Villaris to its essence, there can be no escape from the fact that before the organization of the cooperative, Villari testified he was prevented from obtaining a reasonable income from the slaughtering plant, but that after the cooperative-Villari relationship was established the Villaris obtained an income of $750 per week despite the fact that the cooperative sold the meat for the same prices to substantially the same customers. This result was achieved only because the retailers were willing to absorb the losses necessitated by the price regulation and to guarantee a weekly profit to the Villaris out of the capital invested in the cooperative. Clearly, there would be a direct violation of the Act if the Villari customers had subsidized S. Villari & Sons to guarantee a weekly profit, and it is no less a violation to attempt the same result through the cooperative association. The conclusion cannot be otherwise merely because the stockholders were not defrauded and because the cooperative was organized in a legal manner, openly and publicly. There is no "legal" method of evading the Price Control Act.

In enacting the Emergency Price Control Act of 1942, the Congress declared its purpose to be stabilization of prices to prevent wartime inflation by maintaining existing price levels. To carry out this policy, the Congress delegated to the Price Administrator the power to establish price ceilings for commodities. In the exercise of the price fixing power, the Price Administrator has established a maximum price for wholesale meat which, it may well be, is so low that Villari and other independent slaughterers similarly situated are unable to operate at a profit. It is not the province of this Court to comment on the wisdom of this price fixing policy, but rather it is the duty of this Court to determine whether there has been any violation of the regulations established within the judgment of those to whom the Congress has delegated this power. Similarly it is the duty of the Villaris to abide by the price regulations applicable to their business endeavors. If the Price Administrator has erred, the remedy of the defendants is not evasion of the price regulations. The Congress has provided a remedy for them by the establishment of the Emergency Court of Appeals, to which tribunal they can appeal for relief from any unjust prices fixed by the Price Administrator. The relationship between the Moore Street Retail Meat Cooperative Association and the Villaris was established to assure the Villaris a fixed weekly profit at the expense of their customers so that the Villaris would continue to operate their plant in the very face of a price regulation fixing a maximum consideration to be paid by Villaris's customers. This arrangement is clearly an evasion of the Act and must be enjoined by this Court.

The Administrator also seeks damages of $308,175, treble the amount of the stock subscriptions made by the members of the cooperative. Since the stock subscriptions were, in fact, part of the consideration for the purchase of meat by the members from the cooperative, and since the members paid the actual ceiling price to the cooperative for each individual sale of meat, plaintiff contends that the consideration in excess of ceiling prices received by the cooperative during the entire period of operation was the total amount of the stock subscriptions.

The overcharge was paid directly to the cooperative, but a portion of this over-

charge reached the Villaris in the form of rent and salary. Although the cooperative was organized by the retailers, and although the Villaris were not stockholders, officers or directors of the association, the cooperative was in fact under the domination and influence of the Villaris. The Villaris were essential to the effectiveness of the cooperative association. Only so long as the Villaris consented to be bound by the lease and contract of employment and performed their duties thereunder could the cooperative engage in the intended business operation. The Villaris used this dependence of the cooperative upon them to influence and dominate the organization. The Villaris were present at the meetings of October 3, 1944, and January 3, 1945, at which the cooperative was recapitalized. It was Sam Villari or his attorney, Mr. Dennis, who told the members that unless more capital was invested that the cooperative must cease business. In other words, unless more capital was provided to pay for livestock and to pay rent and salaries to the Villaris, the Villaris would consider the contracts at an end and would no longer slaughter meat for the cooperative. It is apparent that the Villaris used the cooperative as a conduit to carry a flow of $750 each week to themselves from the overcharges paid by the stockholders. The receipt of this money was a part of an evasive practice, to which the Villaris were parties, designed to circumvent the provisions of the price regulation. The Villaris must be held liable in damages for that portion of the overcharge which they received as parties to a relationship which evaded the price regulation.

■ Defendants Wilson, Braun and Kanefsky, officers of the cooperative, held only nominal positions and took no active part in the organization or operation of the cooperative. Since they were not active participants in the cooperative-Villari relationship, no judgment for damages or injunction should be entered against them.

■ Section 205(e)[2] of the Emergency Price Control Act provides for the assessment of damages not exceeding three times the amount of the overcharge in the discretion of the Court. Mr. Dennis, counsel for Samuel Villari, consulted several government departments, including the War Food Administration, the Small Business Bureau of the Anti-Trust Division of the Department of Justice, and the local office of the Office of Price Administration, and made full disclosure of the contemplated organization of the cooperative. After these consultations, it was the considered opinion of Mr. Dennis that the proposed plan would not violate the price regulations. The cooperative was legally organized according to the laws of the State of Pennsylvania. The members, who were also the customers of the cooperative, were fully informed at all times of all relevant facts concerning the financial position and prospectus of the cooperative. Because of these mitigating factors, defendants should be liable in damages only for the amount of the overcharge and not for treble damages. Accordingly, judgment may be entered in the following manner: (1) Against Samuel Villari and Moore Street Retail Meat Cooperative Association for $19,800; (2) against Peter Villari and Moore Street Retail Meat Cooperative Association for $2,475; (3) against John Villari and Moore Street Retail Meat Cooperative Association for $2,475; (4) against Moore Street Retail Meat Cooperative Association for $77,975.

The opinion is limited to the facts of this case. I do not hold that cooperative associations which are organized in good faith, which do not limit the amount of merchandise which a stockholder may purchase from the cooperative to an amount proportionate to his investment, and which do not condition the purchase of merchandise on the sale of stock in the association evade the Price Control Act merely because the cooperatives may suffer losses and these losses may require the investment of additional capital by its members.

---

[2] 56 Stat. 33 as amended June 30, 1944, 58 Stat. 640, 50 U.S.C.A.Appendix § 925(e): "* * * the seller shall be liable for reasonable attorney's fees and costs as determined by the court, plus whichever of the following sums is the greater: (1) Such amount not more than three times the amount of the overcharge, or the overcharges upon which the action is based as the court in its discretion may determine * * * Provided, however, That such amount shall be the amount of the overcharge * * * if the defendant proves that the violation of the regulation, order, or price schedule in question was neither wilful nor the result of failure to take practicable precaution against the occurrence of the violation."

## Conclusions of Law.

1. This Court has jurisdiction of this action brought by the Administrator of the Office of Price Administration pursuant to Section 205(a) (e) of the Emergency Price Control Act of 1942 as amended, to enjoin acts and practices of defendants constituting violations of Section 4(a) of the Act, and of Revised Maximum Price Regulation No. 169, "Beef and Veal Carcasses and Wholesale Cuts", 7 F.R. 10381, as amended, and for treble damages on behalf of the United States of America.

2. This Court has jurisdiction over the defendants.

3. At various times since July 15, 1944, and until the date of these proceedings, defendants Samuel Villari, Peter Villari, John Villari, individually and as copartners trading as S. Villari & Sons, and defendant Moore Street Retail Meat Cooperative Association have engaged in acts and practices which constitute violations of Section 4(a) of the Emergency Price Control Act of 1942 as amended,

(a) By evading and attempting to evade the price limitations set forth in Revised Maximum Price Regulation No. 169 in connection with the offer, solicitation, agreement, sale and delivery of and relating to beef and veal, by way of a charge for shares of capital stock sold by defendants Samuel Villari, Peter Villari, John Villari, individually and as copartners trading as S. Villari & Sons, and defendant Moore Street Retail Meat Cooperative Association to their retailer customers as a condition and prerequisite to the purchase by them from defendants of beef and veal, thereby violating Section 1364.406(a) of said Regulation; and

(b) By selling and delivering beef and veal carcasses and wholesale cuts to retail establishments not wholly owned or operated by defendants Samuel Villari, Peter Villari, John Villari, individually and as copartners trading as S. Villari & Sons, and defendant Moore Street Retail Meat Cooperative Association under an arrangement and device whereby defendants received for the beef and veal a greater realization than they would be entitled to receive under said Revised Maximum Price Regulation No. 169 for the sale of such beef or veal to retailers, thereby violating Section 1364.406(c) of the Regulation.

4. An injunction should issue enjoining the defendants Samuel Villari, Peter Villari, John Villari, individually and as copartners trading as S. Villari & Sons, and Moore Street Retail Meat Cooperative Association, their officers, directors, servants, agents, employees and attorneys and all persons in active concert or participation with any of them, jointly and severally, from:

(a) Selling or delivering any beef or veal carcasses or wholesale cuts, at higher prices than the maximum prices permitted by Revised Maximum Price Regulation No. 169, as heretofore or hereafter amended, or any other regulation issued by the Office of Price Administration pursuant to the Emergency Price Control Act of 1942 as amended, establishing maximum prices for the commodities; and

(b) Selling or delivering beef or veal carcasses or wholesale cuts to retail establishments not wholly owned and operated by defendants, under any arrangement, transaction or device whereby defendants receive for the beef or veal a greater realization than they would be entitled to receive under Revised Maximum Price Regulation No. 169, as heretofore or hereafter amended, for the sale of beef or veal to the retailer; and

(c) Demanding, charging or receiving any moneys for the purchase of stock or otherwise, as a condition to the sale or delivery of beef or veal carcasses or wholesale cuts; and

(d) Selling or delivering beef or veal to the stock purchasers and stockholders of defendant Moore Street Retail Meat Cooperative Association as such, or selling or delivering beef or veal pursuant to any agreement whereby the purchasers are or have been required to pay more than the maximum prices set forth in Revised Maximum Price Regulation No. 169, as heretofore or hereafter amended; and

(e) Doing or omitting to do any other act in violation of said Revised Maximum Price Regulation No. 169, as heretofore or hereafter amended, or any other regulation issued pursuant to the Emergency Price Control Act of 1942 as amended, establishing maximum prices for beef and veal carcasses and wholesale cuts; and

(f) Offering, soliciting, attempting or agreeing to do any of the foregoing;

And restraining the defendant Moore Street Retail Meat Cooperative Association, its officers, directors, servants, agents, employees and attorneys, from paying to

the defendants Samuel Villari, Peter Villari or John Villari, individually or as co-partners, trading as S. Villari & Sons, or their servants, agents, employees or attorneys, and the latter from receiving or demanding of the former any moneys for services, management fees, rentals, or otherwise, except for the sale and delivery of livestock and meats, and then only the maximum legal prices thereof.

5. Judgment may be entered in favor of plaintiff, on behalf of the United States, against Samuel Villari and Moore Street Retail Meat Cooperative Association in the amount of $19,800.

6. Judgment may be entered in favor of plaintiff, on behalf of the United States, against Peter Villari and Moore Street Retail Meat Cooperative Association in the amount of $2,475.

7. Judgment may be entered in favor of plaintiff, on behalf of the United States, against John Villari and Moore Street Retail Meat Cooperative Association in the amount of $2,475.

8. Judgment may be entered in favor of plaintiff, on behalf of the United States, against Moore Street Retail Meat Cooperative Association in the amount of $77,975.